**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  08-20726-CR-UNGARO/SIMONTON**

**UNITED STATES OF AMERICA,**

  **Plaintiff,**

**v.**

**FREDERICK SMALLS,**

  **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

This matter arose upon Defendant Frederick Smalls' Motion to Suppress Due to Illegal Search of Residence (DE # 17), and Motion to Suppress Statements (DE # 16).  The Honorable Ursula Ungaro, United States District Judge, has referred this matter to the undersigned United States Magistrate Judge (DE # 20).  The Government filed a combined response in opposition to both motions (DE # 24), and the Defendant filed a Reply (DE # 25).  An evidentiary hearing was held on October 1, 2008.  For the reasons stated below, and based upon a review of the record as a whole, it is hereby RECOMMENDED that the Motion to Suppress Due to Illegal Search of Residence (DE # 17) be DENIED; and, that the Motion to Suppress Statements (DE # 16) be GRANTED IN PART, only as to the use in the Government's case in chief of statements made in response to the questioning by Sgt. Carballo regarding injuries the Defendant sustained during the course of his arrest, AND DENIED IN PART, as to the remaining statements.

**I.  BACKGROUND**

Defendant Frederick Smalls is charged in a four-count Indictment with offenses that occurred on or about February 27, 2008 (DE # 1).  Specifically, he is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 1);

possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 2); possession of cocaine, in violation of 21 U.S.C. § 844(a) (Count 3); and possession of a firearm in furtherance of the drug trafficking crime alleged in Count 2, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4).  The evidence which forms the basis for these charges was obtained during the course of a police investigation which led to the entry of the police into the residence of Mr. Smalls, and the seizure of marijuana, cocaine, a digital scale, a firearm, and currency, all of which were inside that residence.

II.   **THE MOTIONS TO SUPPRESS**

A.   **Motion to Suppress Due to Illegal Search of Residence (DE # 17)**

The Defendant alleges that on February 27, 2008, the police officers illegally arrested him when, after he opened the door to his residence in response to their knock, they physically pulled him outside and handcuffed him, and that thereafter they illegally entered his apartment and conducted a warrantless search of the apartment which resulted in the seizure of marijuana, cocaine, a digital scale, a handgun and currency (DE # 17 at 2).  The Defendant contends that the seizure of evidence was illegal, and that incriminating statements he made thereafter were the result of the illegal actions and must be suppressed as fruit of the poisonous tree (DE # 17 at 2 -3).

In response, the Government asserts that Smalls voluntarily opened his door, at which time the police observed marijuana and a digital scale in plain view.  The Government contends that these observations, combined with a tip that Fred Smalls was selling narcotics from that apartment and the odor of burning marijuana emanating from the apartment when the police approached, established probable cause to believe that contraband and evidence were located in the apartment.  In addition, the Government asserts that exigent circumstances arose at that time, which justified the entry into the

apartment to arrest the Defendant and preserve the evidence; and which permitted the police to conduct a protective sweep of the apartment as well.  The Government further contends that once the police were lawfully inside the apartment, they were entitled to seize evidence in plain view, including evidence seen during a protective sweep of the apartment, without obtaining a warrant (DE # 24 at 7-11).

In his Reply, relying on *United States v. Santa*, 236 F.3d 662 (11th Cir. 2000), the Defendant focuses on the argument that the Government cannot sustain the burden of demonstrating that exigent circumstances justified a warrantless entry (DE # 25).  The Defendant emphasized this argument at the conclusion of the evidentiary hearing, arguing that, under the Government's version of events, the police could have lawfully arrested Mr. Smalls at his doorway, but they were required to effectuate this arrest outside the apartment; they were not permitted to enter the apartment to arrest him without a warrant since they did not have probable cause to believe that anybody else was inside the apartment, and thus there were not exigent circumstances to justify the entry (Tr. at 197).

> **B.**   **Motion to Suppress Statements (DE # 16)**

In addition, the Defendant contends that his post-arrest statements must be suppressed since they were made in response to custodial interrogation that occurred prior to the time he was advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and they were involuntarily made (DE # 16).  The motion states that the facts recited in this motion are derived from police reports and the depositions that occurred while parallel criminal proceedings were pending in state court (DE # 16 at 2).  The undersigned notes that the facts alleged in this motion differ from the statement of facts included in the Motion to Suppress which challenges the legality of the search, and also

differ from the testimony given by the Defendant at the evidentiary hearing.  These disparities are resolved in the Findings of Fact set forth below.  Specifically, the Defendant alleges that the police responded to his residence and knocked on the door based on an anonymous tip that Mr. Smalls was in possession of narcotics and two firearms; that when Mr. Smalls answered his front door, the officers smelled marijuana emanating from the residence and observed marijuana on the living room couch, at which point Mr. Smalls was asked to kneel down on the floor of his apartment.  Mr. Smalls was asked if there were firearms in the apartment, and he denied this.  Mr. Smalls then made a slight movement toward the couch, and the police saw the butt of a handgun protruding from between two cushions on the couch.  At that point, Mr. Smalls was pushed down on the floor and handcuffed; and, the officer retrieved the gun from the couch.  The officer then made the following inquiry, "I thought you said there were no guns in the apartment?"  Mr. Smalls responded to this inquiry by making incriminating statements, including that the firearm belonged to him.  The Defendant seeks to suppress these statements.

In addition, the Defendant seeks to suppress statements he made to Miami-Dade Police Sgt. Carballo, who was investigating an injury Mr. Smalls sustained during the course of his arrest; specifically, a cut above Mr. Smalls' eye.  These statements were made at his apartment complex while he was receiving treatment for this cut by fire rescue personnel.

In response, the Government contends that the statements made by Mr. Smalls inside the apartment, after the firearm was discovered, were spontaneous statements that were not in response to interrogation.  Specifically, the Government contends that Detective Andrade was not engaged in the functional equivalent of interrogation when he

exclaimed, upon seeing a firearm, "You f___.  I thought you said there were no guns" (DE # 24 at 4).  Therefore, the Government argues that the Defendant's response, "That's my gun for protection.  You know how dangerous it is out here, a brother's got to protect himself.  I need a gun, people getting killed out here all the time," was not in response to interrogation and was voluntarily made, and therefore the absence of prior *Miranda* warnings does not render those statement inadmissible (DE # 24 at 5, 11-13).

In addition, the Government contends that the statements the Defendant made after Sgt. Carballo asked him how he had obtained the cut above his eye, were not responsive to the question, and therefore were spontaneously volunteered and are admissible despite the absence of *Miranda* warnings (DE # 24 at 13-14). Specifically, the Government asserts that after the Defendant stated he wanted to talk to Sgt. Carballo, Sgt. Carballo stated he wanted to talk to the Defendant, too, and asked, "What happened to your eye?  How did you get that cut?"  The Defendant then stated, "I was sitting on my couch, I heard the loud banging on the door.  I said anybody knocking on my door had better be the police.  They said they were the police.  I thought it was my friends playing around with me."  At that point, an angry crowd approached, the conversation stopped, and the Defendant was moved to the rear of a marked police car.

In the alternative, the Government contends that even if these statements were taken in violation of the requirements imposed in *Miranda*, they were nevertheless voluntarily made, and therefore can be used for purposes of impeachment (DE # 24 at 14 n.4).[1]

---

[1]  The Government makes this argument in a footnote which states, without citation to authority, that even if the statements were involuntarily made, they can be used for impeachment.  The undersigned assumes that the Government meant to say that even if the statements were taken in violation of the requirements of *Miranda*, they

III.   **FINDINGS OF FACT**[2]

At the evidentiary hearing, the Defendant introduced certain photographs of his apartment building into evidence; presented the testimony of third-party witnesses Ivory Allen and Freeman Allen; and, testified on his own behalf.  The Government also introduced into evidence various photographs and other exhibits; and, presented the testimony of Detective Alan Lowy, Detective Alex Andrade, and Sgt. Eddie Carballo.

At the conclusion of the testimony, defense counsel disavowed the testimony of Ivory Allen and Freeman Allen as not credible, since it was contradicted by the testimony of Defendant Smalls (Tr. at 186).[3]

There is a direct contradiction between the testimony of Mr. Smalls and the testimony of the various police officers regarding the events that surrounded his arrest, and the way in which the challenged evidence was seized.  The undersigned rejects the testimony of Mr. Smalls regarding these events as not credible.  As described in more detail with respect to the findings made below, this determination is based on the fact that the police officers all testified consistently and credibly with respect to those events; that certain aspects of Mr. Smalls' testimony were contradicted by his long-time family friends who testified on his behalf; and, that under a common-sense view of the totality of the circumstances, the version of events offered by the police is more

_____

may be used for impeachment, pursuant to *Harris v. New York*, 401 U.S. 222 (1971).  It is well-established, pursuant to *Mincey v. Arizona*, 437 U.S. 385 (1978), that involuntary statements cannot be used for any purpose, including impeachment.

[2]  To the extent that the Findings of Fact are more properly characterized as Conclusions of Law, and *vice versa*, the undersigned intends that they be considered as such.

[3]  Citations in the Report and Recommendation are to the draft real-time transcript that was obtained by the Court.

6

credible.

1.  The investigation which led to the arrest of Mr. Smalls began in January 2008, when Detective Alan Lowy received a Crimestoppers Tip as part of the Miami-Dade County gun bounty program (Tr. at 30-32, 122).  Detective Lowy has been employed by the Miami-Dade Police Department for 25 years.  At the time of these events, he was a detective who had been assigned to the Narcotics Bureau for approximately three years (Tr. at 30).  The gun bounty program provides rewards of up to $1,000.00 to persons who anonymously provide information to Crimestoppers, where that information leads to the arrest of a person for illegal possession of a firearm (Tr. at 31-32, 122).

2.  The tip stated that Frederick Smalls lived at 2287 NW 87th Street, apt. 7, in Miami, Florida, and that he was a black male in his thirties who drove a silver Impala with tinted windows.  The tipster said that narcotics were being sold from this residence, and that there were two 9 millimeter weapons inside the residence.  The tipster also said that Smalls had a violent past, and that he would hurt anybody who came there (Tr. at 32-34).

3.  After receiving the tip, Detective Lowy began an investigation.  He discovered that the address given by the tipster–2287 N.W. 87th St.– did not exist (Tr. at 34).  However, there was an apartment building close to that address, which had the address 2239 N.W. 87th Street.  There was a silver Impala parked at this address, which was registered to Frederick Smalls, with the address 2239 N.W. 87th Street, apt. 7.  In addition, a criminal history check of Mr. Smalls' record revealed a criminal history for armed burglary, narcotics violations, resisting officers and assault.  Detective Lowy drove by this apartment building three or four times, including a couple of times in the morning and a couple of times in the evening (Tr. at 40).  His goal was to determine

7

when the Impala was typically there so that he would know the best time to approach the apartment for the purpose of interviewing Mr. Smalls (Tr. at 40).  He did not observe any activity at the apartment during any of the times he drove by (Tr. at 77).

4.  On February 27, 2008, at approximately 11:00 a.m., Detective Lowy and three other members of his squad–Detective Alex Andrade, Detective Henry Fernandez and Detective Johnny Phillips–traveled to the apartment building to investigate the tip (Tr. at 41-42, 87-88, 106).  They traveled in two unmarked cars–a black SUV and a Ford pick-up truck, and approached the residence at normal speed (Tr. at 44, 106-07).[4]  All of the officers were wearing tactical police vests that displayed the word "police" in large letters, and had their badges displayed (Tr. at 41-42, 140).  Their guns were holstered as they approached the apartment (Tr. at 18, 79).  It was obvious that the detectives who arrived were the police.

5.  Detective Lowy and Detective Andrade walked up the stairs to the Defendant's apartment; Detective Phillips and Detective Fernandez remained downstairs to secure the perimeter in case any of the occupants threw contraband out of the window, or attempted to leave via a window (Tr. at 42, 108-09).  As they approached the apartment, both Detective Lowy and Detective Andrade smelled the odor of burning marijuana emanating from the Defendant's apartment.[5]  It smelled as if somebody was smoking

---

[4]  The undersigned specifically rejects the testimony of witness Ivory Allen that his attention was called to the police activity at the Defendant's apartment because he saw the cars driving through the area at a high rate of speed, that their tires squealed when they rounded the corner to approach the apartment building, and that there was a marked police car as well as the two unmarked cars (Tr. at 16).  This testimony was contradicted by his brother, Freeman Allen, who also testified (Tr. at 97-98); as well as by both detectives who testified regarding their manner of approach (Tr. at 44, 107).

[5]  The undersigned notes that the door to apartment 6 is right next to the door to apartment 7.  Detective Lowy smelled the odor of burning marijuana when he and

marijuana (Tr. at 80).

6.   Detective Lowy knocked loudly on the door, and both he and Detective Andrade  heard movement and "shuffling around" inside the apartment (Tr. at 48, 110). Detective Lowy knocked again and said, "Miami-Dade police"   (Tr. at 48, 110).  After the second knock, Defendant Smalls opened the door (Tr. at 49, 110).  Neither Detective Lowy nor Detective Andrade had his gun drawn; nor did they command that the door be opened (Tr. at 48, 79).  The time that elapsed between the first knock and the door opening was approximately 20 seconds (Tr. at 49).  The person who opened the door resembled the photograph that Detective Lowy had obtained of Defendant Smalls. Detective Lowy asked his name, and he responded, "Fred Smalls" (Tr. at 49).  Smalls appeared to be surprised to see the police when he opened the door–he straightened up and his eyes "lit up" (Tr. at 49-50).

7.   Detective Lowy and Detective Andrade were able to see inside the apartment when Mr. Smalls opened the door; and they both saw a pile of loose marijuana and a digital scale on the couch (Tr. at 49-51, 112).  The marijuana they saw was not burning (Tr. at 80).  The couch was against the wall, about ten feet away from where the detectives were standing (Tr. at 52, 56, 112).

8.   Detective Andrade told Mr. Smalls, "The gig is up, we smell the weed and see it right there, so let's go inside and talk about this" (Tr. at 112).  Detective Andrade ordered the Defendant to sit on the floor, and both detectives walked inside (Tr. at 53, 56, 59,

─────────────────────────

Detective Andrade were each standing on either side of the door to apartment 7, and there was an open window.  Detective Andrade testified that he first smelled the odor of burning marijuana when he was approaching the top of the stairwell, which ends at the walkway/balcony which is in front of the two apartments (See various photographs of apartment complex–DX 1-2; GX 4-6).

112).  The photographs reveal that the apartment is small; there is a living room area, with a partial wall to separate a small kitchen from the living room; and an open dining area next to the kitchen that is not separated from the living room area.  There is a door leading to a bedroom, which is adjacent to the open dining area (GX 4-5).  Mr. Smalls sat on the west side of the living room, toward the open dining/kitchen area.  Detective Lowy walked to the couch to secure the marijuana (Tr. at 60).  Detective Lowy saw a pile of approximately ten grams of loose, cut, marijuana and a digital scale on a board on the couch.  He recognized the digital scale as the type commonly used to weigh marijuana for packaging (Tr. at 52-53, GX 10).  Also on the board was a small glassine envelope containing approximately .5 gram of cocaine (Tr. at 67, GX 9).  There was an additional 40 grams of marijuana in a bag which was on the floor between that couch and a coffee table (Tr. at 67, GX 9).  These items were in plain view as Detective Lowy walked over to the couch, although from outside the door to the apartment he had only seen the 10 gram pile of marijuana and digital scale (Tr. at 52-54, 73, 81).  After entering the apartment, Detective Lowy also saw burnt marijuana cigarets inside the apartment (Tr. at 51).[6]

9.   At the same time that Detective Lowy was walking over to the couch on which they had seen the marijuana and scale, Detective Andrade asked Mr. Smalls if anyone else was inside the apartment, and Mr. Smalls responded, "No" (Tr. at 60, 112).  Detective Andrade asked if there were any guns, and Mr. Smalls responded, "No" (Tr. at 60, 112).

10.   Detective Andrade then called for Detective Phillips and Detective Fernandez

---

[6]  There is no evidence in the record regarding exactly where the marijuana cigarets were located.

to come upstairs (Tr. at 113).  At the same time, Detective Andrade looked over at a small couch or loveseat that was located under the air conditioner, on the same wall as the door and approximately two feet from the doorway and about six to eight feet from where Mr. Smalls was seated on the floor (Tr. at 65, 113).  Detective Andrade saw the butt end of a pistol sticking up from between the back cushion and bottom cushion of this loveseat (Tr. at 61-62, 113).

11.   When Detective Andrade saw the gun, he looked back at Mr. Smalls and saw that Mr. Smalls became visibly agitated and started to rise from his kneeling position (Tr. at 61-63, 114).  Detective Andrade was surprised to see the gun, and exclaimed, "You f___, I thought you said there were no guns in the house!"  (Tr. at 115, 173).  Mr. Smalls than said words to the effect that: "You guys know how it is; a lot of people are getting killed out there; a brother has to protect himself; you guys work around here and know how it is out there" (Tr. at 116).[7]

12.   When Detective Andrade saw Mr. Smalls move, he had a legitimate concern for his safety since Mr. Smalls had not yet been patted down for weapons (Tr. at 114). Detective Andrade then grabbed Mr. Smalls' arm, forced him to the ground and handcuffed him behind his back (Tr. at 115).  Mr. Smalls' head hit the floor, and he sustained a cut above his eye, approximately 1 to 1 1/2 inches long, which bled significantly (Tr. at 61-62, 82).  Detective Andrade called the fire rescue department to

---

[7]  The undersigned notes that Detective Lowy did not hear these statements, although he heard Detective Andrade say, "There's a gun over there, " at which time Detective Lowy turned from securing the marijuana to securing the gun from the couch (Tr. at 61-63).  This does not, however, affect the determination by the undersigned that the statements were made since Detective Lowy was preoccupied with retrieving the gun at the time; and, Mr. Smalls admits that Detective Andrade made the exclamation, although Mr. Smalls denies making any statement himself (Tr. at 173).

provide medical attention to Mr. Smalls (Tr. at 66, 134).

13.   After Detective Lowy removed the gun, Detective Andrade made the gun safe by removing the magazine and eight rounds of ammunition (Tr. at 66).  The gun was a Smith and Wesson 40 caliber handgun (Tr. at 67, GX 8).

14.   Detectives Phillips and Fernandez went inside the apartment in response to Detective Andrade's call, and assisted Detective Lowy in conducting a protective sweep of the kitchen area and bedroom (Tr. at 60).  When the police entered the apartment, they did not know whether anybody other than Defendant Smalls was present; the protective sweep revealed that nobody else was present (Tr. at 60).  During the course of the protective sweep of the bedroom, Detective Lowy observed a stack of currency on the corner of the bed (Tr. at 68).  The currency consisted of five $1 bills, fourteen $5 bills, three $10 bills, four $20 bills, one $50 bill and two $100 bills (Tr. at 68).

15.   In addition to the gun, Detective Lowy seized approximately 10 grams of marijuana and the digital scale he had initially seen when Mr. Smalls answered the door; .5 gram of cocaine which was located on the board next to the marijuana; a second bag which contained approximately 40 grams of marijuana, including a couple of small baggies containing packaged marijuana; and the currency which had been stacked on the corner of the bed.  As stated above, all of these items were in plain view, and Detective Lowy did not move anything in the apartment in order to view them (Tr. at 73).

16.   The fire rescue department and Sgt. Eddie Carballo arrived at about the same time (Tr. at 139).  Sgt. Carballo was the supervisor of the squad that was conducting the investigation (Tr. at 137-38).  By the time they arrived, a crowd had gathered at the apartment complex.  The crowd, which included Mr. Smalls' mother and other relatives, was trying to go to Mr. Smalls' second-floor apartment, and people were yelling and

screaming obscenities at the police (Tr. at 74, 139).  Sgt. Carballo accompanied the fire rescue team into Mr. Smalls' apartment, where they saw Mr. Smalls sitting in handcuffs (Tr. at 142).  Mr. Smalls was calling out, "Momma, momma, look what they're doing, look what they're doing," and the crowd was becoming more chaotic (Tr. at 142-43, 147).  The fire rescue team indicated that they could not treat the Defendant in such chaotic conditions, and Sgt. Carballo decided to take the Defendant to the back of the apartment complex, away from the crowd (Tr. at 147). He told Mr. Smalls to calm down, and told Mr. Smalls to stand up and come with him so that fire rescue could take a look at him (Tr. at 147).  Mr. Smalls stood up with assistance, and proceeded to walk downstairs with Sgt. Carballo (Tr. at 147).  As they were walking downstairs, Mr. Smalls told Sgt. Carballo that he needed to speak with Sgt. Carballo, and Sgt. Carballo responded that he needed to speak to Mr. Smalls as well (Tr. at 149).  When they arrived downstairs, fire rescue began treating the cut, and Sgt. Carballo told the Defendant to let fire rescue take care of him, and that then they would talk (Tr. at 149).  While fire rescue was treating the cut, Sgt. Carballo asked, "What happened to your eye?  How did you get that cut?"  Mr. Smalls said, "I was sitting on my couch, I heard loud banging on the door.  I said anybody knocking on my door that hard better be the police."  Mr. Smalls told Sgt. Carballo that they said they were the police, but that he thought it was his friends playing around with him (Tr. at 149).  At that point, the crowd located Mr. Smalls, and began moving in that direction (Tr. at 144).  Based upon safety concerns, Sgt. Carballo decided to put Mr. Smalls in the back of a marked police car and have him moved to a different location (Tr. at 145).  They then left the area, and no more statements were made by Mr. Smalls (Tr. at 149-50).

17.  There were no photographs taken of the inside of the apartment or the items

13

seized at the time of the seizure because the crowd was becoming rowdy, and the detectives determined that it was prudent to impound the evidence and leave as quickly as possible to prevent further escalation of the disturbance created by the gathering crowd (Tr. at 81). The police were at the apartment for a total of approximately 45 minutes (Tr. at 70).

18. The undersigned specifically finds that Defendant Frederick Smalls and witnesses Ivory Allen and Freeman Allen were not credible witnesses, to the extent their testimony contradicted the testimony of the police detectives and Sgt. Carballo. This finding is based upon the observations of the demeanor of the witnesses during their testimony, the inconsistencies in their testimony, and a common sense evaluation of the totality of the circumstances. In addition, the undersigned notes that the testimony of the law enforcement officers was consistent on all major issues, and did not appear rehearsed or contrived.

The following is a summary of the testimony provided by Mr. Smalls. Defendant Smalls testified that he heard the police knock, announce that they were the police, and say, "Open up the door, open up the door" (Tr. at 156). He looked through the peephole in the door and saw that they were the police (Tr. at 156-57). He then opened the door slightly, at which time five or six police officers, with their guns drawn, pulled the door all the way open, breaking the door chain (Tr. at 158). When they entered, the police shouted, "Police. Police. Are there any guns in here? Where are the guns?" (Tr. at 158). The police had their guns drawn and made Mr. Smalls lay down on the floor when they entered (Tr. at 158, 166). Five or six officers came in and searched the entire apartment (Tr. at 158). The marijuana was found hidden, up under the couch (Tr. at 158). The gun was also found inside the couch (Tr. at 159). When Detective Andrade found the gun, he

14

used the f–word and said "I thought you said you didn't have any guns."  (Tr. at 173).
Detective Andrade then stomped the Defendant's head twice, causing the injury above
Mr. Smalls' eye (Tr. at 159, 173). Mr. Smalls denied saying anything in response to
Detective Andrade (Tr. at 173).  Mr. Smalls testified that he did not know the marijuana
and gun were in the apartment, and that there were a lot of people who stayed there
while he was at work, including his girlfriend, her sister and her sister's boyfriend (Tr. at
164).  He also said that he did not know who the digital scale belonged to, or how it got
into his apartment (Tr. at 168).  Finally, he testified that the currency was under the bed,
not on top of the bed, and that it belonged to his girlfriend (Tr. at 167).  Mr. Smalls stated
that his girlfriend had left earlier that morning to go to work (Tr. at 167).  Defendant
Smalls testified that, contrary to the testimony of the Allen brothers, he had not been
pulled outside of his apartment by the police (Tr. at 174).

        The testimony of Mr. Smalls is not credible for a variety of reasons.  Initially, the
undersigned notes that he has a strong interest in the outcome of this case, that he is a
convicted felon, and that one of his convictions was under an assumed name (Tr. at 165,
169-73).  With respect to his claim that five or six officers forced their way into his
apartment, his testimony contradicts the testimony of two witnesses he called who are
lifelong family friends–Ivory and Freeman Allen.  Both of the Allen brothers testified that
only two police officers initially approached the Defendant's door and entered the
apartment (Tr. at 16, 89-90, 98).  Thus, this aspect of the Allen brothers' testimony
corroborates the testimony of the police.  The Allen brothers also testified that the police
had dragged Mr. Smalls out of his apartment (Tr. at 17, 91), which was flatly contradicted
by the police, and disavowed by Mr. Smalls (Tr. at 174).  Freeman Allen insisted that he
saw the police kick the door inward into the apartment (Tr. at 90-91), despite the fact that

the door obviously opens outward (Tr. at 157).  In addition, Ivory Allen claimed that a uniformed police officer in a marked patrol car arrived at the residence at the same time as the unmarked cars, and that the cars were traveling at such a high rate of speed that their tires squealed (Tr. at 16), which was contradicted by his brother Freeman (Tr. at 97-98), as well as by the testimony of the police.  Thus, although the Allen brothers were not credible witnesses regarding their testimony concerning their claims that the police threw the Defendant to the ground outside his apartment, they were obviously trying to give helpful testimony to their longtime family friend; and, therefore, the fact that they corroborated the testimony of the police regarding the number of officers who approached the door to Mr. Smalls' apartment seriously undermines the claim of Mr. Smalls that there were five or six officers who rushed inside when he opened the door.

In addition, when Mr. Smalls initially testified regarding his claim that the police broke the chain to his apartment door when they forcibly gained entry, he gestured that the chain would only permit the door to open about a foot wide.  When, upon examination of the photograph showing the chain, the Court questioned him about this distance, he admitted that the chain permitted the door to be opened fully enough to permit entry into the apartment, and he revised his estimate of how far the door would open without breaking the chain.  The chain, which is clearly depicted in Government Exhibit 4, is the type of chain which is permanently attached to door and the doorway which would keep the door from extending too far when it is opened and hitting the wall or air conditioning unit next to it, rather than a security type of chain which is designed to permit the door to be opened for only a limited distance, and which must be unlatched to permit entry.  It appeared to the undersigned that the Defendant initially tried to deceive the court into believing that the officers would have had to break the chain in

order to force their way inside the apartment, and that he corrected this only when the falsehood became apparent (Tr. at 179).  Although it is clear that the chain was broken by the time the photograph was taken several months after Mr. Smalls' arrest, the undersigned does not credit the testimony of Mr. Smalls that the police broke the chain when they entered the apartment.[8]

In any event, however wide the door was opened by Mr. Smalls, the undersigned credits the testimony of Detective Andrade and Detective Lowy that the door was opened voluntarily in response to their knocking, and that marijuana and a digital scale were in plain view when the door was opened.  Mr. Smalls' testimony that he was unaware of the marijuana and gun inside his apartment, and that he did not know who the digital scale belonged to or how it got there, is simply not credible.

IV.    **CONCLUSIONS OF LAW AND LEGAL ANALYSIS**

   A.    **The Entry Into and Search of the Defendant's Apartment**

      1.  **Introduction**

The legal principles applicable to this case are not disputed.  Since warrantless searches and seizures are presumptively unreasonable under the Fourth Amendment, the Government bears the burden of proving an exception to the warrant requirement, such as consent, or probable cause coupled with exigent circumstances.  *Payton v. New York*, 445 U.S. 573 (1980); *United States v. Burgos*, 720 F.3d 1520, 1525-26 (11th Cir. 1983).  Based upon the analysis set forth below, the undersigned concludes that the Defendant voluntarily consented to open his door in response to the police knocking on the door; that once he opened the door the police had probable cause to arrest him and

---

[8]  Even if they had broken the chain, that fact would not alter the ultimate findings and conclusions in this Report and Recommendation.

to believe that there was contraband inside the apartment; that exigent circumstances arose after the police presence at the Defendant's front door was known, and these circumstances justified the warrantless entry into the Defendant's apartment to effectuate his arrest and seize the evidence in plain view; and, the police were justified in conducting a protective sweep of the entire apartment incident to his arrest, since all areas of the apartment adjoined the area where he was arrested.

**a. *The Encounter at the Front Door of the Defendant's Apartment***

It is well-settled that the police may approach a residence and knock on the door for any legitimate reason. *United States v. Taylor,* 458 F.3d 1201, 1204 (11th Cir. 2006). Any demand, however, that the door be opened, and any subsequent entry into the residence to either search for evidence or to make an arrest, must be pursuant to a warrant or an exception to the requirement of a warrant.  In *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc), the Eleventh Circuit addressed the issue of consent in the context of a subject opening the door in response to knocking by the police.  There, the Court held that the defendant had voluntarily opened his door where the agent and a backup officer, who were in plain clothes and had weapons which were not drawn, knocked continuously for three or four minutes and called out to the occupants, requesting them to open the door; the Court specifically rejected the argument that under these circumstances the defendant had opened the door in response to "a show of official authority."   923 F.2d at 1512.   *Bumper v. North Carolina*, 391 U.S. 543, 548-50 (1968); *compare United States v. Ramirez-Chilel*, 289 F.3d 744, 747, 750-51 (11th Cir. 2002) (consent given in response to request for entry was voluntary despite the fact that four agents approached defendant's residence shortly before midnight, and requested admittance to determine whether there were any counterfeit

documents located inside the residence, and the defendant then "yield[ed] the right-of-way" to the officers although he made no verbal response); *with United States v. Tovar-Rico*, 61 F.3d 1529, 1535-36 (11th Cir. 1995) (opening door in response to show of official authority was not voluntary consent); *and United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) (opening door in response to FBI command was not voluntary consent).  Thus, at the outset, the Government must establish that the defendant voluntarily opened his door of his own free will, and not in response to a show of official authority.

In the case at bar, it is clear that the Defendant voluntarily opened his door, and that his actions were not merely in response to a show of official authority.[9]  Detective Lowy was accompanied at the door only by Detective Andrade.  Although they wore their police vests and badges, they were in plain clothes and their guns were not drawn.  Detective Lowy knocked on two occasions and announced that they were the police, but he did not make any demand or give any order for the door to be opened.  The time that elapsed between the first knock and the door opening was only approximately 20 seconds.  The totality of the circumstances here establish that the Defendant was not in any way coerced into opening the door, and place this case squarely within the scope of *Tobin*.[10]

---

[9]  The undersigned notes that, in the Motion to Suppress, the Defendant did not contend that his act of opening the door was involuntary, and this issue does not appear to be raised.  However, since the Defendant testified that he was ordered to open the door, the issue is addressed here, despite the fact that his testimony has been rejected as not credible.

[10]  The Government also argued that probable cause existed prior to the door being opened, when the police smelled the odor of burning marijuana.  The undersigned concurs that even if the Defendant had not voluntarily opened the door, probable cause was established by the odor of marijuana emanating from the apartment, particularly

b.  *Entry Into The Defendant's Apartment*

To justify the warrantless entry into the apartment, the Government asserts that once the door was opened, the police had probable cause to believe that contraband was inside the apartment, and that exigent circumstances required them to enter immediately to arrest the Defendant and prevent the loss or destruction of evidence. The thrust of the Defendant's challenge is that there were no exigent circumstances which justified the entry into the apartment.  Specifically, the Defendant contends that there was no evidence that anybody else was in the apartment, and that the police therefore

---

when combined with the information contained in the Crimestoppers tip and the corroborating information learned by Detective Lowy prior to the approach to the residence.  *See, e.g.*, *Hardy v. Broward County Sheriff's Office*, 238 Fed. Appx. 435, 441 (11th Cir. 2007) (noting that under Florida law, possession of cannabis is either a misdemeanor or felony depending on the amount, and concluding that odor of "burnt cannabis" emanating from partially open door of apartment gave rise to "probable cause to believe that someone inside the apartment had been smoking cannabis and that this cannabis could be found somewhere inside the apartment" and that "had the Deputies delayed entering the apartment, they risked the 'loss, destruction, removal, or concealment of evidence' of this suspected crime, thereby creating exigent circumstances."); *United States v. Floyd*, 247 Fed. Appx. 161 (11th Cir. 2007) (smell of burning marijuana that emanated from house when defendant opened the door, combined with information from a confidential informant that defendant was a substantial drug dealer, established probable cause to believe that search of house would reveal evidence of a crime, and created exigent circumstances to enter the house); *United States v. Cephas*, 254 F.3d 488, 494-96 (4th Cir. 2001) (police lawfully approached apartment and knocked on door, based on a tip that young girl was smoking marijuana inside the apartment; when the door opened, the odor of marijuana coming from apartment and observation of young girl inside the apartment established probable cause and exigent circumstances to enter apartment), *citing United States v. Grissett*, 925 F.2d 776 (4th Cir. 1991) (odor of marijuana coming from a motel room provided exigent circumstances to justify a warrantless entry); *United States v. Sentovich*, 677 F.2d 834, 838 n.8 (11th Cir. 1982) (DEA agent's "detection of an odor of marijuana was sufficient alone for a finding of probable cause" to support warrant to search luggage from which the odor emanated, regardless of reliability of canine alert; but affidavit also included information that carrier of the luggage was a documented drug violator and domestic drug courier, and an anonymous tip indicated that marijuana was being transported from airport at which carrier departed); *United States v. Gorthy*, 550 F.2d 1051, 1052 (5th Cir. 1977) (odor of marijuana emanating from living quarters of motor home constituted probable cause for search).

should have arrested him at the doorway and placed him outside while they obtained a

warrant to search the apartment.

### i. Probable Cause

In *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983), the United States Supreme Court

held that a determination of probable cause must be based an evaluation of the totality

of the circumstances, and set forth the following guidance:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception."  *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id., at 175.

The Court then provided the following standards to apply when determining the

existence of probable cause:

> " '[T]he term "probable cause,"  . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion.' [Locke v. United States, 7 Cranch 339, 348 [11 U.S. 339, 348, 3 L.Ed. 2d 364] (1813).]... Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision.
>
> . . . .
>
> "The task . . . is simply to make a practical, common- sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."

462 U.S. at 235, 238-239.  In deciding whether probable cause exists, the court may

examine the collective knowledge of law enforcement officers involved in the

investigation.  *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).

The Defendant does not dispute that the testimony of the officers, which the

undersigned has credited, established probable cause to believe that there was

contraband and evidence of drug trafficking inside the apartment, as well as probable

cause to arrest the Defendant.  The undersigned agrees–it is clear from the cases cited

in footnote 10 in the previous section that probable cause was established by the partly

corroborated anonymous tip which stated that narcotics were being sold by Mr. Smalls

and that he had two firearms inside his apartment, combined with the investigation that

led to the subject apartment, the odor of burning marijuana, and the observation of loose

marijuana and a digital scale on the couch when the door opened.

### ii.  Exigent Circumstances

In *United States v. Santa*, 236 F.3d 662 (11th Cir. 2000), the Eleventh Circuit set

forth the analysis which must be used to determine whether exigent circumstances

justify a warrantless entry:

> The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983).  Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal or concealment of evidence; and 'hot pursuit' of a fleeing suspect."  *Blasco*, 702 F.2d at 1325.
>
> This circuit has recognized that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed."  *Tobin*, 923 F.2d at 1510 . . . "The mere presence of contraband, however, does not give rise to exigent circumstances."  *Lynch*, 934 F.2d at 1232.  "The test of whether exigent circumstances exist is an objective one. '[T]he appropriate inquiry is whether the facts ... would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *Tobin*, 923 F.2d at 1510 . . . .

236 F.2d at 662.

The Court emphasized, however, that the exigency which justifies the warrantless

entry cannot be one that is created by the police.  Thus, in *Santa*, the Court held that

exigent circumstances did not justify the warrantless entry into the defendants'

apartment to arrest the defendants where the law enforcement agents had advance

notice that the defendants were going to conduct a narcotics transaction with an informant at that location.  On at least two occasions during the day, the defendants had advised the informant that he could purchase heroin at the defendants' apartment.  The arrangements called for the informant to inspect the drugs inside the apartment and then, if the drugs looked good, to leave the apartment to get the money, and return thereafter to complete the exchange.  The DEA established surveillance at the apartment prior to the designated time for the exchange.  As planned, the informant entered the apartment, viewed the drugs, and then left.  As the informant left, a signal was given to the DEA to indicate that the drugs were present.  The DEA then entered the apartment, arrested the defendants, and conducted a protective sweep of the apartment.  The Court held that the only exigencies were created by law enforcement, and therefore the warrantless entry violated the fourth amendment.  The Court emphasized that the record did not establish that the suspicions of the defendants would have been aroused if the informant did not return prior to the time that a warrant was obtained; and in the alternative, that an anticipatory warrant could have been obtained which would have permitted the search once the informant verified that the drugs were present.  The Court also emphasized that a warrant for the arrest of the defendant could have been obtained prior to the consummation of the transaction based upon what had transpired up to that point, and that the agents would have been permitted to delay execution of the arrest warrant to avoid compromising the ongoing continuing investigation.

Similarly, in *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995), the Court held that a warrantless entry into an apartment was not justified by exigent circumstances since there was insufficient evidence to establish that anyone inside the apartment was aware of the police activity in and around the apartment building.

Therefore, using an objective test, the court held there was insufficient evidence to show "an experienced police officer would reasonably believe that those inside the house [were] likely to be alarmed and destroy evidence." *Tovar-Rico*, 61 F.3d at 1535.

On the other hand, the Eleventh Circuit has recognized that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc), *quoting United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990). Numerous cases have held that the smell of marijuana emanating from a residence gave rise to both probable and exigent circumstances which justified a warrantless entry. *See, e.g.*, *Hardy v. Broward County Sheriff's Office*, 238 Fed. Appx. 435, 441 (11th Cir. 2007) (noting that under Florida law, possession of cannabis is either a misdemeanor or felony depending on the amount, and concluding that odor of "burnt cannabis" emanating from partially open door of apartment gave rise to "probable cause to believe that someone inside the apartment had been smoking cannabis and that this cannabis could be found somewhere inside the apartment" and that "had the Deputies delayed entering the apartment, they risked the 'loss, destruction, removal, or concealment of evidence' of this suspected crime, thereby creating exigent circumstances."); *United States v. Floyd*, 247 Fed. Appx. 161 (11th Cir. 2007) (smell of burning marijuana that emanated from house when defendant opened the door, combined with information from a confidential informant that defendant was a substantial drug dealer, established probable cause to believe that search of house would reveal evidence of a crime, and created exigent circumstances to enter the house where others were present inside); *United States v. Cephas*, 254 F.3d 488, 494-96 (4th Cir. 2001) (police lawfully approached apartment and knocked on door,

based on a tip that young girl was smoking marijuana inside the apartment; when the
door opened, the odor of marijuana coming from apartment and observation of young
girl inside the apartment established probable cause and exigent circumstances to enter
apartment), *citing United States v. Grissett*, 925 F.2d 776 (4th Cir. 1991) (odor of
marijuana coming from a motel room provided exigent circumstances to justify a
warrantless entry).

      The requirement of exigent circumstances obviously applies to entry into a
residence to effect an arrest, as well as to conduct a search.  In *McClish v. Nugent*, 483
F.3d 1231, 1241-48 (11th Cir. 2007), the Eleventh Circuit established that a person
standing inside his home when he answers the door may not be arrested without a
warrant absent probable cause and exigent circumstances.  In *McClish*, the police
approached the defendant's house and knocked on the door.  When he answered the
door, the police pulled him outside and arrested him.  The Court held that, under *Payton*,
the Fourth Amendment's protection against in-home warrantless arrests begins at the
"firm line" at the threshold of the home; and, this was violated by the police reaching
across the doorway to pull McClish outside and arrest him.  Since the police had been
aware of the crime for hours before they went to the residence, there was time to obtain
a warrant, and there were no exigent circumstances which justified this "entry" and
warrantless arrest.

      In *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir. 1987), the Court set
forth the following factors to guide the determination of whether exigent circumstances
justify a warrantless in-home arrest: "(1) the gravity or violent nature of the offense with
which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3)
probable cause to believe that the suspect committed the crime; (4) strong reason to

believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public.  Thus, in *Standridge* the Court held that exigent circumstances justified the warrantless entry into a motel room to arrest a suspect for bank robbery where he had attempted to rob one bank and actually robbed another one earlier that day, there was reason to believe he was armed, he could have been warned by the person who provided his address to the FBI, his photo was on a television news report and he might dispose of the stolen cash or other evidence when he learned that the police knew his identity, and any delay increased the risk of danger to the community if he tried to leave the motel room while the FBI waited to obtain a warrant.

The undersigned concludes that exigent circumstances justified the entry into the apartment both to effectuate the arrest of the Defendant, and to seize the evidence seen inside the apartment.  In contrast to the police in *McClish*, the officers in this case did not have probable cause to obtain either a search warrant or an arrest warrant prior to the time they approached the apartment.  At the earliest, probable cause was established when they were at the door to the apartment, wearing vests which clearly identified them as the police, and they smelled marijuana burning.  However, by that time, their presence had been made known, as evidenced by the testimony of the Allen brothers, and their departure to obtain a warrant would create an unacceptable risk of loss or destruction of evidence.  Moreover, as noted by the Eleventh Circuit in *Tobin*, 923 F.2d at 1511, law enforcement officers are not required to halt their investigation as soon as they have the minimum evidence necessary to establish probable cause.  Therefore, it was reasonable for the officers to continue their investigation by knocking on the door.  Once the door

opened, they saw marijuana and a digital scale in plain view.  The Defendant remained inside the apartment, at the doorway.  At that point, the police were permitted to enter the apartment both to ensure that the evidence in plain view was not destroyed and to arrest the Defendant.

### c.  *The Protective Sweep of the Apartment*

The Defendant's primary argument following the evidentiary hearing was that the police should have pulled Mr. Smalls out of his apartment after he answered the door, and that therefore it was not necessary to conduct a protective sweep, *i.e.*, the apartment could have been secured from outside, while a warrant was obtained.  For the reasons set forth below, the undersigned concludes that this argument is not well-founded.

In *Maryland v. Buie*, 494 U.S. 325 (1990), the United States Supreme Court held that the Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest, and set forth the permissible circumstances and scope of such a sweep.  At the outset, the Court noted that a "protective sweep" is a quick and limited search of premises which is conducted incident to arrest and for the purpose of protecting the safety of the police or others.  494 U.S. at 327.  In *Buie*, the police possessed a warrant for the arrest of Mr. Buie on armed robbery charges, and had reason to believe that he was inside his residence when they entered to effect his arrest.  They entered the residence and proceeded to search for Buie.  Eventually, Buie emerged from the basement and was placed under arrest.  Thereafter, the police entered the basement to ensure that nobody else was there.  They saw clothing which matched the clothing worn by the robber, and seized it as evidence under the plain view doctrine.  The issue presented was whether the police had the right to conduct a protective sweep of  the basement after Buie had been arrested and handcuffed.  The Court held that such

27

a sweep was permissible under the Fourth Amendment, and provided the following guidance:

> We ... hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

494 U.S. at 1098.

In *United States v. Standridge*, 810 F.2d 1034 (11th Cir. 1987), the Eleventh Circuit applied these principles to uphold a protective sweep of a motel room and adjoining bathroom which occurred immediately after agents burst into the room and forcibly arrested the defendant on bank robbery charges.  In reaching this result, the Court noted that there was uncertainty as to whether there might be others present.

Other Courts have similarly approved a limited protective search of adjoining areas.  For example, in *United States v. Thomas*, 429 F.3d 282 (D.C. Cir. 2005), the Court upheld the protective sweep of the bedroom, where the defendant was arrested in the hallway of a one-bedroom apartment, immediately inside his front door.  The Court noted that although this permitted a protective sweep of the entire apartment without reasonable suspicion, this action was constitutional in the context of a small apartment:

> The safety of the officers, not the percentage of the home searched, is the relevant criterion.... If an apartment is small enough that all of it "immediately adjoin[s] the place of arrest" and all of it constitutes a space or spaces "from which an attack could be immediately launched," then the entire apartment is subject to a limited sweep of spaces where a person may be found.

429 F.3d at 287-88.  The Court also rejected the defendant's argument that since he was arrested immediately inside his doorway, the police should have moved him outside forthwith and the protective sweep was therefore unnecessary.

Similarly, in *United States v. Charles*, 469 F.3d 402 (5th Cir. 2006), the Court upheld the protective sweep of a storage unit and the car parked inside that unit, following the arrest of the defendant immediately outside the unit.  The defendant in *Charles* was inside the unit when the police arrived to arrest him; the defendant was ordered out of the unit and to the ground.  He complied and was placed under arrest and handcuffed.  The police then entered the unit and checked inside the unit, including under and around the car.  During the course of the sweep, the police saw a firearm in the corner of the unit, and crack cocaine inside the car.  The defendant moved to suppress this evidence on the grounds that a protective sweep was not justified because the officers had no reasonable suspicion that other individuals were present inside the storage unit.  The Court expressly rejected this argument:

> Charles fails to recognize, however, that under the Supreme Court's holding in *Maryland v. Buie*, the police may, "as a precautionary matter and *without probable cause or reasonable suspicion,* look in closets or other spaces *immediately adjoining the place of arrest from which an attack could be launched.*"  494 U.S. at 334 (emphasis added).  Testimony offered at trial indicated that Charles was arrested just at the entrance to the open storage unit, which measured approximately 10 feet wide and 25 feet deep.  Officer Picard entered the storage unit to ensure that no other person was hiding in, under, or around the convertible.  Under *Buie*, Officer Picard's cursory sweep of the unit immediately adjacent to the site of the arrest was permissible, even without probable cause or reasonable suspicion.

469 F.3d at 405-06.

In the case at bar, the police properly arrested the Defendant inside his

apartment.  Therefore, under *Buie* and its progeny, they were entitled to conduct a protective sweep of all areas which adjoined the area of his arrest, even absent reasonable suspicion that others were present.  The protective sweep of the Defendant's apartment occurred immediately after the arrest of the Defendant and was the cursory type of sweep that is permitted under *Buie*.

The Defendant has cited no authority, nor could the undersigned locate any authority, which requires the police to remove a defendant from inside his apartment to effectuate an arrest outside the apartment; and, although not binding precedent, the Court in *Thomas* expressly rejected this argument.  Moreover, even if they had done so, in the case at bar the photographs and description of the Defendant's apartment reflect that it was so small that all areas of the apartment searched by the police adjoined the area of arrest at the doorway.  Therefore, under the holdings and rationale expressed by the courts in *Buie, Standridge, Thomas*, and *Charles*, a protective sweep of the entire apartment would nevertheless have been permissible.  It is clear from the photographs that the living/dining room area in which the Defendant was arrested adjoined both the kitchen and bedroom, and there was a short distance between the front door and the bedroom.  Under these circumstances, the police were entitled to ensure their own safety by determining that nobody else was present in those areas.

### d.  *The Plain View Doctrine*

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  *Accord Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) (police are not required to avert their eyes).  Thus, the first

requirement is that the object be viewed from a location where the police have a right to be; the second requirement is that the incriminating character be immediately apparent; and, the third requirement is that the police have the right to access to the place where the object is located.  As explained by the Court in *United States v. Rodgers*, 924 F.2d 219, 222-23 (11th Cir. 1991), where contraband is viewed from outside a residence, the third requirement is met and police are permitted to enter that residence to seize the contraband, if there are exigent circumstances.  Thus, when there is danger that evidence seen inside a residence may be destroyed or removed before a warrant can be obtained, the police are permitted to enter the residence and seize the contraband.  *Id.*

In the case at bar, all three requirements are met.  As stated above, exigent circumstances permitted the police to enter the apartment, arrest the Defendant, and seize the evidence which was in plain view when the Defendant opened the door.  All of the remaining evidence was in plain view either in the living room area when the police arrested the Defendant and secured the marijuana and digital scale on the couch, or, with respect to the currency, observed during the protective sweep in plain view on the bed.  Therefore, the police were permitted to seize this evidence without first obtaining a warrant.

### B.    The Challenged Post-Arrest Statements

The Defendant seeks suppression of post-arrest statements he made on two occasions, contending that they were made in response to interrogation, or the functional equivalent of interrogation, and that he had not been advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 478 (1966).  The Government agrees that the statements were made after the Defendant was arrested, and that he had not been advised of his *Miranda* rights.  However, the Government contends that the statements

are nevertheless admissible since they were volunteered, and were not in response to the functional equivalent of interrogation.  For the reasons set forth below, the undersigned concludes that the statements made by the Defendant, following the exclamation by Detective Andrade after he saw the gun, are admissible because they were volunteered and not responsive to the functional equivalent of interrogation. However, the undersigned concludes that the statements made to Sgt. Carballo, following his questions regarding the injury above the Defendant's eye, were in response to the functional equivalent of interrogation, and therefore are not admissible in the Government's case in chief.

### 1.  Framework for Analysis

#### a.  *The Necessity of Miranda Warnings*

Prior to conducting an interrogation of a defendant who is in custody, the Government has the burden to prove by a preponderance of the evidence that the Defendant was properly advised of his rights, as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and that he made a knowing, voluntary and intelligent waiver of those rights, and that any subsequent statements were voluntarily made.  *United States v. Chirinos*, 112 F.3d 1089, 1102 (11th Cir. 1997); *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994).   However, it is axiomatic that statements which are not made in response to interrogation may be used by the Government without violating the Fifth Amendment, regardless of whether *Miranda* warnings have preceded them. *See e.g.*, *United States v. Moody*, 977 F.2d 1425 (11th Cir. 1992).

In *Rhode Island v. Innis*, 466 U.S. 291, 298-303 (1980), the United States Supreme Court addressed the issue of what constitutes "interrogation" for purposes of determining whether a *Miranda* violation has occurred.  There, the Court held that

express questioning is not required, but that the "functional equivalent" of questioning also constituted interrogation–the critical inquiry was whether there were "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id.* at 301.

In *Innis,* the Court applied this test to hold that the functional equivalent of interrogation had not occurred, despite the presence of the defendant during conversation between police officers that resulted in the defendant making an incriminating statement. The defendant in *Innis* was arrested on robbery charges following a report that a man with a sawed-off shotgun had just robbed a taxi driver. The defendant was unarmed at the time of his arrest. He was advised of his *Miranda* rights at the scene of his arrest and invoked his right to counsel. He was then placed in a police car, which began to transport him to the police station. En route, two of the police officers who were transporting the defendant from the place of his arrest to the police station had a conversation concerning the fact that "a school for handicapped children is located nearby" and that the police needed to continue to search for the weapon so that one of the children would not pick up a loaded gun. *Id.* at 294-95. The defendant then interrupted the conversation and stated that the officers should turn the car around and he would show them where the gun was located. The Supreme Court held that this brief conversation, even though it in fact elicited an incriminating response, was not the functional equivalent of interrogation since there was no evidence to support the conclusion that the officers "should have known that their conversation

33

was reasonably likely to elicit an incriminating response."

The test of whether a statement by the police "was reasonably likely to elicit an incriminating response," focuses on the perception of the subject.  However, the Supreme Court recognized in *Innis* that "the intent of the police is [not] irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.  In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect."  446 U.S. at 301 n.7.  The Court also emphasized that the term "incriminating response," includes "any response–whether inculpatory or exculpatory–that the *prosecution* may seek to introduce at trial."  *Id.* at 301 n.5.

The Eleventh Circuit and its predecessor court, the former Fifth Circuit, have both considered the circumstances under which questions posed by the police should be excluded from the scope of what is considered interrogation within the meaning of *Miranda*.  Three days prior to the above decision in *Innis*, the former Fifth Circuit considered the issue in *Harryman v. Estelle*, 616 F.2d 870 (5th Cir. 1980) (en banc). [11] There, the defendant was arrested following the discovery of a stolen rifle and narcotics paraphernalia in his motel room, and stolen license plates on the car he had registered with the motel when he checked in.  During a search of the defendant's person incident to his arrest, an officer found a condom containing a white powdered substance tucked in the back of the defendant's waistband.  Upon this discovery, and prior to advising the

---

[11]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit rendered prior to October 1, 1981.

defendant of his *Miranda* rights, the officer exclaimed, "What is this?" and the defendant responded, "Oh, you know what it is.  It is heroin."  In holding that this question constituted interrogation prohibited by *Miranda*, the court expressly rejected the contention of the state that the statement of the officer was an exclamation of surprise, and not the type of questioning that *Miranda* was designed to control.  *Accord Jacobs v. Singletary*, 952 F.2d 1282, 1291 n.7 (11th Cir. 1982) (rejecting the State's attempt to graft a "rhetorical question" exception to the *Miranda* rule).

The Eleventh Circuit distinguished *Harryman* in *United States v. Castro*, 723 F.2d 1527 (11th Cir. 1984).  There, two Customs agents observed suspicious circumstances at a house located on the water as they patrolled the coastline.   They docked their boat near the rear of the house, and smelled a heavy odor of marijuana emanating from the house.  Therefore, they ordered the occupants of the house to come downstairs.  The defendant was the first person to come downstairs, and he was greeted by an armed agent whose gun was drawn, and who asked, "What in the world is going on here?"  The defendant responded, "You want money? We got money."  The Court first rejected the Government's contention that the agent's question did not constitute interrogation, and held that the defendant had been subjected to custodial interrogation.  However, since the statement he made was not responsive and was "spontaneously volunteered . . . in a deliberate attempt to commit a totally separate crime–bribery of a law enforcement official" it was not improperly compelled by the officer's question and did not fall within the safeguards of *Miranda*.  723 F.2d at 1530.  In reaching this result, the Court expressly distinguished *Harryman* on the grounds that in *Harryman*, the defendant's statement had been responsive to the question, whereas in *Castro* the statement was unresponsive and "constituted a deliberate attempt to commit a separate crime."  *Id.* at 1532.

Under certain circumstances, even where the police initiate conversation with an in-custody defendant, there is no Fifth Amendment violation. The type of question that is not "reasonably likely to elicit an incriminating response" under these circumstances is illustrated in *United States v. Gelzer*, 50 F.3d 1133, 1138 (2d Cir. 1995). There, the defendant was arrested following a high speed chase that occurred shortly after the robbery of a post office. While transporting the defendant to the police station, the arresting officers "discussed between themselves the probability that the arrest and resulting paperwork would jeopardize their respective plans for New Year's Eve. The only question directed at [the defendant] was an inquiry as to what [the defendant's] New Year's plans had been." The defendant responded, "We're amateurs, not professionals." In upholding the admissibility of this statement, the Court held that, "Neither the topic of this sociable question nor the general tenor of discussion created an atmosphere that was 'reasonably likely to elicit an incriminating response.' [The defendant's] claim of amateur status was volunteered, was not the product of interrogation, and was therefore admissible." 50 F.3d at 1138.

### b.  *Voluntariness*

It is well-settled that statements made in violation of the requirements of *Miranda*, may nevertheless be voluntary. *See Oregon v. Hass*, 420 U.S. 714 (1975); *Harris v. New York*, 401 U.S. 222 (1971). In determining voluntariness of a confession, the test is similar to the test for determining the voluntariness of a waiver of rights. The key focus is whether there was police overreaching such that the will of the defendant was overborne by intimidation, coercion or threats. *See e.g., Colorado v. Connelly*, 479 U.S. 157, 166-67 (1986) (to establish a confession is involuntary, the defendant must establish police coercion); *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996); *Moore v. Dugger*,

856 F.2d 129, 132 (11th Cir. 1988) (mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness; and, fact that defendant was generally calm and responsive during interrogation, that he did not appear confused and that he understood the questions put to him established an valid waiver of *Miranda* rights, despite low IQ of defendant).

### 2.  The Statements Made to Detective Andrade

The first challenged statement occurred after Detective Andrade saw the gun which was stashed between the cushions in the couch.  Upon discovery of the gun, Detective Andrade exclaimed, "You f____, I thought you said there were no guns in the house" (Tr. at 115, 173).  Mr. Smalls then stated, in substance, "You guys know how it is; a lot of people are getting killed out there; a brother has to protect himself; you guys work around here and know how it is out there" (Tr. at 116).  The undersigned finds that the exclamation made by Detective Andrade was a spontaneous exclamation of surprise at seeing a gun so close to where Mr. Smalls was seated, and that it was not said in a questioning tone of voice.  Focusing on the perception of the subject, as required by *Innis*, the exclamation by Detective Andrade was not reasonably likely to elicit an incriminating response, nor was it intended to do so.  In fact, the statement made by Mr. Smalls was not even directly responsive to the exclamation, which concerned his lack of truthfulness.  Rather, it was an explanation of why he had the gun.

Therefore, the undersigned concludes that the statement made by Mr. Smalls to Detective Andrade was volunteered; was not made in response to interrogation or its functional equivalent; and, was voluntary and not coerced.  Therefore this statement is admissible into evidence in the Government's case in chief.

### 3.  The Statements Made to Sgt. Carballo

The second challenged statement occurred after Sgt. Carballo arrived on the scene with fire rescue and began his investigation of the use of force which led to the cut above Mr. Smalls' eye.  Unlike the first statement, this statement was made in direct response to the question by Sgt. Carballo, "What happened to your eye?  How did you get that cut?"

The undersigned credits the testimony of Sgt. Carballo that he was not focused on the criminal investigation, and his intent was to elicit information regarding whether the detectives had used an appropriate level of force in arresting Mr. Smalls.  However, under *Innis*, the test is whether the question is reasonably likely to elicit an incriminating response when viewed from the perspective of the subject.  In this case, Mr. Smalls answered the question by beginning with an explanation of  the sequence of events that led to his injury.  The discussion of these events was interrupted by the approach of an angry crowd which necessitated moving him to the back of a patrol car.

The Government has focused on the fact that Sgt. Carballo did not intend to investigate the criminal activity, that the statement made by the Defendant was not directly responsive to the question.  Viewing the facts surrounding the injury as well as the question, however, the undersigned concludes that it was reasonably likely to elicit an incriminating response.  According to the testimony of Detective Andrade, the Defendant's eye was cut when Detective Andrade forced the Defendant to the ground after Detective Andrade saw the gun in the couch.  According to Detective Andrade, the Defendant realized that Detective Andrade had seen the gun, and started to rise. Detective Andrade was concerned that the Defendant was going to try to get the gun, or that there was another gun in close proximity.  The injury is therefore closely associated

with the firearms offense charged in this case, and is also associated with a possible charge of resisting arrest, or attempting to flee. The fact that the Defendant's answer was interrupted before he finished an explanation of what happened does not alter this result.[12]

The Government has also emphasized the fact that the Defendant had stated that he wanted to speak to Sgt. Carballo.  There is no exception to the requirement of *Miranda* warnings where a defendant who has been arrested states that he wants to speak to the police.  However, this fact does bear on the issue of voluntariness.  Based upon the totality of the circumstances, the undersigned concludes that the statement was not coerced or involuntary–the Defendant had not been in custody for a lengthy period of time; he had received quick medical treatment for his injury; he had been removed from the location of the detective who caused the injury, and, was in the custody of a police sergeant who had not been involved in the entry or search of the apartment; the question was directed to the cause of his injury rather than to criminal behavior; he was no stranger to the criminal justice system since he had numerous prior arrests; and he had already stated he wanted to speak to Sgt. Carballo.

Therefore, pursuant to *Harris v. New York*, 401 U.S. 222 (1971), the Government may use these statements for purposes of impeachment, if appropriate to do so.

C.    Summary of Conclusions of Law

In sum, the undersigned makes the following conclusions of law:

1. The Defendant voluntarily opened the front door to his apartment in response

---

[12]  This case is wholly unlike *Castro*, the case upon which the Government has placed heavy reliance.  The statements in *Castro* were admissible because they were not responsive to the question and also constituted a deliberate attempt to commit the separate crime of bribery.  723 F.2d at 1532.

to the knocking by Detective Lowy.

2.  The entry into the Defendant's apartment did not violate the Fourth Amendment.

a.  There was probable cause to believe that contraband was inside the apartment based upon the anonymous tip, the odor of marijuana burning, and the plain view observations of marijuana and a digital scale.

b.  The entry into the apartment was justified by exigent circumstances.

3.  The protective sweep of the apartment following the Defendant's arrest was a reasonable search permitted under the Fourth Amendment.

4.  The evidence impounded by the police was properly seized under the plain view doctrine.

5.  The Defendant's statement to Detective Andrade was not a response to the functional equivalent of interrogation, and is admissible as a volunteered statement.

6.  The Defendant's statement to Sgt. Carballo was made without the benefit of *Miranda* warnings in response to custodial interrogation, in violation of the Fifth Amendment, and is therefore inadmissible in the Government's case in chief.

7.  The Defendant's statement to Sgt. Carballo was voluntary, and may be used for impeachment purposes.

V.     CONCLUSION

Based upon a review of the record as a whole, the undersigned finds and concludes that the actions of the police in entering the Defendant's apartment, and seizing evidence in plain view, did not violate the Defendant's Fourth Amendment right to be free from warrantless and/or unreasonable searches and seizures.  In addition, the statements made by the Defendant to Detective Andrade were volunteered, as well as

voluntary, and not obtained in violation of the Defendant's Fifth Amendment privilege against self-incrimination.  The statements made in response to questioning by Sgt. Carballo were voluntary, but were made in response to custodial questioning that occurred without the benefit of *Miranda* warnings, and therefore must be excluded from the Government's case in chief.  Therefore, it is hereby

**RECOMMENDED** that the Motion to Suppress Due to Illegal Search of Residence (DE # 17) be **DENIED**; and, that the Motion to Suppress Statements (DE # 16) be **GRANTED IN PART**, only as to the use in the Government's case in chief of statements made in response to the questioning by Sgt. Carballo regarding injuries he sustained during the course of his arrest, **AND DENIED IN PART**, as to the remaining statements.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in chambers in Miami, Florida, on October 16, 2008.

*Andrea M. Simonton*
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:
The Honorable Ursula Ungaro
        United States District Judge
All counsel of record via CM/ECF

41